This is a statutory interpretation case under Medicare. Principal issue in this case is what does it mean to be a hospital under Medicare? Four years ago, Kearney Regional Medical Center opened as a brand new acute care hospital in Kearney, Nebraska. After opening, Kearney underwent an on-site survey to become approved to bill Medicare. The survey was conducted by the American Osteopathic Association, which was a private credentialing organization that was specifically vetted and approved by CMS, the Centers for Medicare and Medicaid Services. That survey took place over three days. It involved an inspection of the facility, its staffing, its licensure, its policies and procedures. The survey team reviewed charts and medical records and conducted telephone interviews among the 28 patients, including 21 inpatients that Kearney had provided service to prior to the survey. The AOA granted Kearney accreditation and recommended to CMS that the facility be admitted to the Medicare program as a hospital effective January 28, 2000. Counsel, is it factually significant that the patients surveyed were patients who were not actually in the hospital when the team came to do the accreditation inspection? No, I don't believe it's dispositive in any way, Your Honor. In fact, there's nothing in the statutory definition of a hospital that in any way requires there to be inpatients at the time of the survey. But it seems like the legal dispute in this case comes down to that phrase and the significance of it primarily engaged in patient care, or something to the nature of patient care. And not having patients at the time of the inspection seemed to be consequential to the evaluation of your facility. That's the reason that CMS gave initially for denying certification. Saying that we're denying certification not because there's any apparent problem with quality of service or capabilities of the facility, just simply we've got an automatic rejection policy. We're going to reject an application when there were no inpatients present at the time of a survey. Now that automatic rejection policy was based on the Arizona Surgical Hospital case? No, Your Honor. In fact, there's nothing in the statute that supports an automatic rejection policy for lack of inpatients. There's no regulation on point that supports or suggests in any way that CMS has an automatic rejection policy. The most that CMS can point to in this particular case is an operations manual that was provided to state government accrediting services. But the government admits that that manual didn't apply, wasn't binding on private accreditation services such as the AOA. An organization that was specifically vetted and approved by CMS to conduct these surveys. My understanding of the facts, and you can correct me if I'm wrong, that Carney had provided these patients and the service that they had provided for the patients before they were accredited, so that was on their dime so to speak. Absolutely. And then when the person that the Bureau designated to come do the inspection came, they were inquired, do we need to have inpatients during this period of time? And they were told by that entity, which was sent to them by the government, that they didn't have to do that, is that right? That is correct. Not the facts? That is correct. And so those would have still been on Carney's dime had they had to do it, but they were told that they didn't have to do that, they would rely on the patient records that had been made by the fully staffed hospital before that? And that is the facts that we're dealing with here? That is correct. Yes, Your Honor. And so, but then they said, well, you're okay, you've been approved, but we can't give you the Medicare certifications and so forth because you weren't an operating hospital at that, during this time of the inspections by this entity? Is that how this came down? What happened was the hospital opened up. It obtained its state license, opened its doors on, I believe it was December 9th. And for about three weeks, it continued to operate. It operated as a hospital. It admitted inpatients. I think there were 21 inpatients admitted during those three weeks. It treated out, performed outpatient procedures, all on the hospital's dime. Then the survey was conducted. Carney was ready, willing, and able to admit inpatients during the time of that survey. They had a full staff on duty. They had patients that could have been admitted. But they specifically asked the survey team, do we need to have inpatients present? And the survey team expressly said, no. Does this case turn on who is given deference in terms of the definition of what primarily engaged in means? Your Honor, I would submit that CMS is not entitled to any deference in this case. Under Chevron, when there is no regulation on point, and there is no regulation on point in this case, the agency is not entitled to deference. Is this a straight statutory interpretation case? Absolutely. What difference does it make then whether the surveyor told your people that you didn't need patients? That wouldn't have anything to do with what the statute means, would it? I think what we have here is CMS is advocating an interpretation of the statute, which the Departmental Appeals Board and the District Court gave deference to. But CMS is advocating an interpretation of the statute that I believe is unreasonably narrow and flies in the face of common sense. Suppose the surveyor had said, yeah, you probably should have inpatients here, and then you didn't have inpatients here. We'd be dealing with the same factual situation other than that, representation, and you say you would still win even if you were told you need patients here and you didn't have them? If we had been told that we needed patients there, we would have had patients there, in which case we would have been granted certification as of January 28, 2014. And we wouldn't have about a three-month period of time. You're not really answering the question, though. You're saying that it's a question of statutory interpretation, and I'm saying suppose there were no patients there and there was no representation that you didn't need patients there. Now, as I understand your position, you should still win because you say the statute doesn't allow them to deny you based on the fact that you didn't have patients there. I think that is right, Your Honor. Why would that be unreasonable? Why is that? If you had no patients for that substantial period of time, why couldn't they say you didn't meet the definition of hospital? Because in this particular case the agency was operating according to a secret policy that wasn't known. The agency could have... If the agency believed that there was a reasonable construction of the statute that it wanted to advocate for, it could have engaged in normal rulemaking. Yeah, but why can't they make... You think they can't do it by adjudication? They can't make rules by adjudication? Isn't that basic administrative law that that's also an option? Well, yes. The Chinnery case recognizes that ad hoc adjudication is appropriate in certain circumstances. But the court in that case specifically warns that those circumstances should be limited to those instances where there is a risk of mischief or malfeasance. Well, isn't there some slight risk of that here? You can have individuals representing that they're going to have patients, representing they're going to do these various things, and here are our facilities, and it's all intended to eventually conduct a scam and not actually function as a hospital? No, Your Honor, because in this particular case we had 3 weeks of operations. We had 28 patients that we had provided services to prior to the survey. So then it seems, when you go there, it seems to me that your argument is somewhat of an estoppel argument, that they should have been a stop from going against the recommendation that was made by, in essence, their agent, telling you you don't need patients. And so you trusted that and you relied on it to your detriment. When you say that you didn't have to at all, that looks at the statute, and they can look at the statute. You looked at the statute. You look at it and say, well, we don't need patients. They look at it and say, oh yeah, you do, because in order for us to put our money out, we're going to need to have verification that this is functioning in practice and in reality as a hospital. But they had proof that it was functioning as a hospital based on... At a prior time. I'll go ahead and answer the question, and I have one for you. At a prior time, the immediate three weeks before the date of the survey. And the survey team conducted an inspection of those charts and medical records, performed telephone interviews among those patients. So we're not talking about an extended period of time. CMS tries to compare this case to Arizona Surgical, AM Health, Home Health Services, but this case isn't like those. Let's get into it. As I understand, the department referred this dispute to an administrative law judge. And the administrative law judge said you weren't primarily engaged in providing inpatient treatment as the basis for his turning down the application. Is that right? Yes. And he based that upon the Arizona Surgical hospital case that had been decided earlier. Isn't that right? That's correct, Your Honor. And the facts of that case was that the hospital in that case had been under a state sanction. Carney was never under a state sanction here, was he? No. If we're interpreting what the statute says, then this all has to be taken into account. It doesn't seem to have been by the department and the administrative law judge since that time. Am I wrong on that? You're not wrong at all. Your opposing counsel will clear me up on that. You're not wrong at all, Judge Beam. The Arizona Surgical case was a very different circumstance than what we have here. As you noted, in that case, the facility had been shut down. It lost its license to operate for a period of time. It was under sanction. We don't have that here. There's no evidence in the record that any problems of any significance were ever noted with regard to Carney. In fact, after CMS rejected Carney's initial application, a resurvey was performed by the AOA. There's nothing in the record to suggest that that survey was any different than the first survey. So the citizens of Carney, who ponied up the money to establish Carney Regional Medical Center, are holding the bag for $21 million worth of funds that the people paying their social security stipends to the government should have forked over to them. Is that the bottom line that you're arguing? I don't believe it's $21 million, Your Honor. I don't know the exact figure off the top of my head. But it is north of a million, million and a half dollars in terms of net reimbursements that the hospital would be entitled to if its application had been initially approved as of January 28, 2014. When we talk about the equities of the situation, why couldn't it be said that you made a tactical choice to try to forego caring for those patients until you got the certification and that ended up not making you qualified? Part of the process here is you have to establish that you are engaged primarily in caring for inpatients and that requires some upfront costs before you get certified. And the hospital incurred that upfront cost? They incurred three weeks, but the question is whether you have to continue incurring that until you get the certification or to show you're primarily engaged. I don't view Carney's decision as being a tactical, voluntary decision, Your Honor. Well, you described it as a financial responsibility decision. Yes, Your Honor, but I note that the balance of my time is up. Can I ask you a question? Thank you. I don't believe it was a voluntary, tactical decision because I don't think that the government's standard had been publicized and had been made known to applicants to its own survey teams that had been approved to conduct these surveys. See, I hear a lot of your argument to be based on either notice or this estoppel-type theory that Chief Judge Smith mentioned, not really on what the statute means. Now, maybe there's something to that. You didn't have proper notice or the other side should be estopped. I didn't read your brief to be arguing that. I thought you were just arguing straight up what the statute means. Yes, we are, Your Honor. And we believe that the statute doesn't provide or require there to be inpatients on the particular days of the survey. To require that would essentially impose a standard of, we're going to evaluate a facility and whether or not it's primarily engaged looking at a very narrow, specific snapshot in time. I don't think you can do that. That's certainly not a common sense understanding of the phrase primarily engaged in business. That's certainly not what the people who received those services in December of 2013 believed. I believe if you asked any of them, they would have understood they were receiving services from a hospital that was primarily engaged as a hospital. Thank you, Mr. Perry. Thank you, Your Honor. Mr. Salzman. Thank you, Your Honor, and may it please the Court. Josh Salzman on behalf of HHS. While I don't think we need it to win here, this case is an instance where the agency's adjudication is entitled to substantial deference. And the district court was right to conclude that. This case, in fact, falls in the heartland of the kind of agency adjudications that receive deference. The agency was construing the Medicare statute, which Congress has specifically tasked HHS with administering. The decision is reasoned. It spans some 16 pages. The decision was issued pursuant to an express grant of adjudication authority that's found in 1395 CC subpart H. The decision is intended to be binding on the parties. It's the final decision of the agency that establishes the rights and obligations of the parties. And the decision is designed to serve as a precedent in future cases. The board here discussed its own prior decisions in this area. And this decision, likewise, was intended to contribute to that body of precedent. And, in fact... Yes, your honor. The decision you're talking about required what now? I'm referring to the final decision of the Departmental Appeals Board, which is the decision actually under review here, pursuant to 1395 CC. So what that decision was... Yeah. Oh. Go ahead. What that decision was was a determination by the Departmental Appeals Board that, at the relevant time, Kearney Regional Medical Center did not meet the definition of a hospital, as spelled out in 1395 X subpart E. Because it wasn't an operating hospital? Because it was not primarily engaged in providing services to inpatients. What statutory or regulatory authority sets the time frame for what you described as the relevant period? So I don't think the statute answers the question. That's why there was a gap here for the board to fill, which is precisely why Chevron deference is appropriate here. Now, there was a lot of precedent that gave notice, and I do want to get into the notice issues, including the board's own precedents in cases like Arizona Surgical. There was also a statement in the state operating manual that, if you want to conduct a survey, there need to be enough inpatients there to make a reliable assessment about whether the facility is operating properly. So how would an entity know that that period includes not only the time prior to the inspection, but the inspection itself? So, a few ways, Your Honor. One is the plain language of the statute itself is phrased in the present tense. You need to be...is primarily engaged. So that's one factor that the board pointed to. Second, the board noted that its own precedents had consistently construed the statute as requiring ongoing provision of services. It pointed to three cases, all of which were issued prior to the board's decision in this case. That's the Arizona Surgical case, the United Medical case, and the AM Health case. All of those were 2003, 2008, 2010 decisions of the board. The survey, the inspection here was in January of 2014. So there was a body of precedent already there. Well, how did the board's assigned assessors go wrong in telling the hospital that they didn't have to have people there? So, two things, Your Honor. One, I want to be clear that the entity that came and did this, the American Osteopathic Association, is a private accrediting entity that was... Approved by the bureaucrats. So Carney made the choice to use a private accrediting entity. That's an alternative mechanism of getting this certification. The primary method spelled out in the statute is through... And it was that certification that ultimately did the job. Isn't that right? Yes. So under 1395BB, what can happen is instead of getting a survey by the state survey entity, what you can do is reach out to a private accrediting entity which, as you said, has already received approval from CMS. And they will come in and give you a private accreditation. Now that accreditation doesn't entitle you to participate in Medicare. CMS will then look over that accreditation and has the ability to say whether or not it was sufficient. But CMS retains the power and retains the responsibility for making the ultimate determination here. And that you can see in 42 CFR 488.7. That CMS is still going to go back behind the entity and make the determination. So what about the original question? How did the Osteopathic Association go wrong in giving its advice to CARNI? I don't know what... I can't speculate as to what happened there. I can tell you that there was a body of precedent here that already said you need to be primarily engaged. There was a state operating manual that noted that you need patients present. And I want to note that all of this seems to ultimately tie, if we're going to say what's the legal relevance of this, to the estoppel notion that I believe Chief Judge Smith averted to earlier. And I want to be clear. CARNI made an estoppel argument before the ALJ. The ALJ rejected that at addendum page 38. The board affirmed that conclusion at addendum page 25. And I haven't seen in the district court or in this court, CARNI to have renewed its estoppel challenge in express terms. Because I think if you look at the ALJ's reasoning, it was sound as to the basis for rejecting that estoppel argument. So ultimately what I think this court is confronted with, though, is a statutory term primarily engaged in providing services to inpatients. We have an expert agency board issue a final decision construing that term. It's a reasoned decision. It's consistent with prior board precedents. It gives meaning to the term. And I think under those circumstances, it is appropriate to give deference to that determination. Is there any problem with retroactivity? Absolutely not, Your Honor. Because, first of all, the board was construing the statute as what it- adjudication inherently involves some degree of retroactivity. Right, that's my question. And yet there is an ample body of precedent saying- Is it automatic, since it does inherently involve some retroactivity, that it's permissible, or is there some judgment? I don't think there's judgment. I think if you look at INS v. Aguirre-Aguirre, which is a Supreme Court case relating to the Board of Immigration Appeals, the Supreme Court said that the agency gets deference as it gives content to a statute through a series of fact-bound, case-by-case adjudications, which help spell out and embody the meaning of this- and help expound on the meaning of that statute. There are, as we note in our briefs, ample circuit precedents suggesting that these board decisions receive Chevron deference. And the Supreme Court, in the Albane case, suggested that the board would normally receive deference, though in that case it found that the board's decision was- that the deference was overcome. But I think it is Hornbook law, as Your Honor said earlier, that adjudications can- is a form of agency interpretation that can and does receive Chevron deference. This determination here bears all the hallmarks of one of those determinations. It reasonably construes the statute. It's not in conflict with prior board precedent. Indeed, it's the best reading of the board's prior precedents. So I think even if we weren't getting the deference, the outcome here was right. When an entity stops altogether for tactical reasons, makes a voluntary choice- and I would say that the board's decision is expressed on this point. There's a factual finding supported by substantial evidence that this was a voluntary choice to stop providing services if you only have three weeks of provision of services and then you stop altogether, that that is not primarily engaged. I do want to talk about the Arizona Surgical Center and the comparison of the facts there because Your Honor, Judge Beam brought that up earlier. The board noted that the facts here were not exactly the same as Arizona Surgical, but found that those factual differences actually cut against Carney. What the board said, and I think this is at addendum page 24, is that a facility that has a history of providing services may more reasonably show that a brief interruption doesn't mean that you've given up the provision of those services, but that if you don't have an established record, if you've never even demonstrated to HHS at the outset that you're primarily engaged in providing services, that if anything, the threshold should be higher. It certainly shouldn't be lower. So this is a reasoned decision of the board that considered all of these factors and it reached a reasonable conclusion that's supported by statutory text and it's supported by the board's own precedents. On the retroactivity point, you know the reply brief has this section about Chenery. You recall that? I do, Your Honor. You didn't have an opportunity to answer that in your brief. That's why I wanted to ask you an oral argument whether Chenery, as described here, suggests there are some cases in which even though the agency can act through adjudication, it might not be permitted to apply a decision retroactively. I don't think so, Your Honor. I think in the more than 50 years, 70 years since Chenery II was decided, there's an ample body of precedent that has evolved that in precisely circumstances like these, when the Departmental Appeals Board issues decisions, that it is going to receive deference in deciding that. Because that's what Congress tasked this board with doing. Keep in mind, in 42 U.S.C. 1395cc subpart H, Congress assigned to HHS responsibility for deciding precisely these challenges. Counsel, why should a court accord any deference on a straight statutory interpretation? The court is amply qualified to make a determination as to what a statute means without giving any deference to an administrative law judge. Well, that's the heart of Chevron, Your Honor, and you're right. We haven't really talked about the two steps of Chevron individually, but I'd like to turn to that. Because, as Your Honor notes, judges are amply qualified to decide plain meaning when the plain meaning of the statute is sufficient to resolve the case. That's step one of Chevron. That seems to be the position of both parties in this case. No, I don't think so, Your Honor. What we've said is that there's a gap. You said we don't need Chevron to win this case. I thought by that you meant you should win at step one. Oh, no, I was not saying... You mean? I said if there was... I don't think the statute here is sufficiently plain on its face to resolve this question. I think that there's an ambiguity. And at that point, there's a gap to be filled, which the board did fill with its decision. But we've consistently litigated this case as a step two case. That's how we argued in district court. That's how the district court decided it. And that's the argument we've made in this court. So what did you mean that you don't need Chevron to win the case? All I was trying to say there, Your Honor, is this isn't one of those cases where maybe the agency's reading isn't really that great, but we're just sort of appealing to deference as a way to overcome that. What I'm saying is there's an ambiguity here. There's a gap to be filled. The agency's answer here is a reasonable one and, indeed, I think the best one. But you don't even need to decide whether it's the best one or not because it's certainly reasonable, which is sufficient when the agency is filling a gap at step two of Chevron. If the panel... Yes, Your Honor. Well, I think there's a petition for cert before the United States Supreme Court by a series of people to obliterate Chevron deference. But we probably don't have that to look at now. Chevron has been challenged at various points, but it has been consistently reaffirmed, and it's still certainly the law of this circuit and the law of the Supreme Court. OK. All right. Anything further? Why do you say you would win without Chevron because your interpretation is the better interpretation? What makes it better? I think the board's decision here is quite sound in light of the present tense phrasing of the statute, in light of the legitimate concerns in wanting to see a facility in operation and to have it up and running before they're eligible to participate in Medicare. Keep in mind, Congress made a decision, and this is embodied even further in the agency regs, that before a facility is eligible to participate in Medicare, it needs to already be a hospital. There was a judgment made here that we don't want facilities joining the Medicare program and getting the entitlement to start receiving payments from the federal government until they really establish that they are qualified providers. So does that entail some amount of startup costs? Does that mean that they have to begin servicing inpatients before they're able to get reimbursement from that? Yes, but that's a judgment baked into the statute, into 1395 CC subpart B, that says you have to already meet the definition of being a hospital before you're eligible to get a provider agreement. And that's further embodied in 42 CFR 488... It's either .3 or .4, that says if you are not already meeting the definition of a hospital, you are not eligible to be a provider. And part of what that means is you have to already be providing services to inpatients. Did the agency refer this dispute to an administrative law judge? So there's a multi-step review process here that's spelled out in 42 CFR 498.5. And the way that works is first you go to CMS, and CMS here said you don't get it. Then you're supposed to ask for reconsideration from CMS, and CMS, again, on reconsideration, denied. Then the next step is you go to an administrative law judge. We have an ALJ decision that's in your addendum. And then if you want further review, Carney asked to go to the administrative law judge, and then after that they took it up to the Departmental Appeals Board. That's the final decision of the agency. That's what this court has jurisdiction to review. If the administrative law judge had held for Carney, the agency still was in a position to say, I don't think so. I think if the administrative law judge had ruled for Carney, Carney would have prevailed. Candidly, Your Honor, I'm not sure if CMS has the right to appeal the administrative law judge's decision. So basically we're reviewing the ALJ's decision. No, you're reviewing the decision of the Departmental Appeals Board. Based upon the ALJ's decision. Well, but the Departmental Appeals Board certainly drew on the factual findings of the ALJ, but this was a 16-page reasoned decision of the Departmental Appeals Board, and that's what's under review. Thank you. Thank you, Your Honors. Thank you, Mr. Salzman. Mr. Peck, I believe you used your time. Okay. All right. Thank you, counsel. We appreciate your presence this morning and the arguments you provided to the court. A fascinating case, interesting issue, and we'll do the best we can with it. Thank you.